**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EDWARD PLOTZKER,

                    Plaintiff,

       -against-

KIPS BAY ENDOSCOPY CENTER, LLC, and
KIPS BAY ANESTHESIA, P.C.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 08 2017

MEMORANDUM DECISION
AND ORDER

12 Civ. 9255 (GBD)

GEORGE B. DANIELS, United States District Judge:

    *Qui tam* relator Dr. Edward Plotzker brought this cause of action against Kips Bay Endoscopy Center, LLC ("Kips Bay") and Kips Bay Anesthesia, P.C. ("KBA") for unlawful termination based on alleged whistleblower activity in violation of the anti-retaliation provisions of the False Claims Act, 31 U.S.C. § 3730(h) ("FCA") (Count One); the New York False Claims Act, N.Y. State Fin. Law § 191 ("NYFCA") (Count Two); and the New York state Labor Law § 740 (Count Three).   (Second Am. Compl. ("SAC"), ECF No. 23.)[1]   Plaintiff alleges that Defendants terminated his employment in retaliation for Plaintiff complaining about Defendants' alleged Medicare and Medicaid fraud.  (*Id.* at 1.)

    Defendants moved for summary judgment to dismiss Plaintiff's SAC pursuant to Rule 56 of the Federal Rules of Civil Procedure and for an award of attorneys' fees and costs.  (Defs.' Mem. Supp. Mot. for Summ. J., ECF No. 52.)   In response to Defendants' motion, Plaintiff

---

[1] Plaintiff voluntarily dismissed his breach of contract claim (Count Four).  (*See* Stipulation & Order of Partial Dismissal, ECF No. 31.)

withdrew his New York state Labor Law § 740 claim[2]; therefore, the only remaining claims at issue are under the federal and New York state False Claims Acts.

Defendants' motion for summary judgment is GRANTED. Defendants' request for attorneys' fees and costs is DENIED.

## I.   FACTUAL BACKGROUND

Kips Bay is an ambulatory surgery center, which performs gastrointestinal endoscopic procedures. (Defs.' 56.1 Stmt., ECF No. 53, ¶ 1.) Kips Bay is managed by Dr. Charles N. Friedlander, who also serves as medical director. (*Id.* ¶ 4.) On or about September 28, 2009, KBA began operations, and was hired by Kips Bay to provide services for a flat fee in relation to three HMOs—Signa, Blue Cross/Blue Shield, and the New York State Empire Program—that had such requirements. (*Id.* ¶ 6.)

In 2008, Plaintiff began working as a per diem anesthesiologist for Kips Bay. (*Id.* ¶ 13.) Later that year, Plaintiff approached Dr. Friedlander to discuss a full-time position. (*Id.* ¶ 15.) Dr. Friedlander, who has the authority to hire and fire employees, hired Plaintiff on a full-time basis, and became his immediate supervisor. (*Id.* ¶¶ 5, 15–16.) Thereafter, like all other Kips Bay anesthesiologists, Plaintiff also became an employee of KBA. (*Id.* ¶ 17.)

In January 2012, a mock inspection was performed at Kips Bay by Health Care Consulting International ("HCI") to help Kips Bay prepare for an accreditation survey performed by the Accreditation Association for Ambulatory Heath Care, Inc. ("AAAHC"), and to identify any deficiencies that needed to be addressed. (*Id.* ¶¶ 31–32.) Carol Hiatt, an independent contractor

---

[2] (*See* Pl.'s Opp'n to Defs.' Mot. Summ. J. ("Opp'n"), ECF No. 69, at 4.)

for HCI, was the lead consultant, and Dr. Kristine Mighion, HCI's CEO and managing director, assisted Ms. Hiatt (together, the "Consultants") with the inspection. (*Id.* ¶¶ 33–34.)

Plaintiff's retaliation claims are premised on what he claims he discussed during the mock inspection on January 10, 2012, prior to the beginning of a medical procedure. (Pl.'s 56.1 Counter-Stmt., ECF No. 70, ¶ 44.) The other individuals present in the procedure room aside from Ms. Hiatt and Plaintiff, were Dr. Mighion, head Nurse Kimberly Ahwal, and Kips Bay endoscopist Dr. Inessa Khaykis. (Defs.' 56.1 Stmt. ¶ 36.)

Plaintiff claims that during a conversation he disclosed to the Consultants that although he evaluates the patients himself and prepares his own history and physicals ("H&Ps"), the doctors performing procedures at Kips Bay frequently do not prepare H&Ps at all, as patients would "make an appointment for a procedure, and they [would] meet the doctor for the first time in the room." (*Id.*) In response, Plaintiff contends, Ms. Hiatt turned to Nurse Ahwal and said "[y]ou were cited for that in 2008 by the [AAAHC]. They are going to fail you if you don't fix it." (*Id.*) Ms. Hiatt then allegedly turned to Plaintiff and said "Dr. Plotzker, don't you know that is Medicare fraud?" Plaintiff claims he responded to the Kips Bay employees in the room, "[y]es, and I am going to report you for it." (*Id.*)

Plaintiff also claims that during the conversation he also informed the Consultants that patient consent forms were not done properly at Kips Bay as nurses were "asking patients to sign for procedures which have risk for patients, for doctors who have never met the patient." (*Id.*) Plaintiff testified that Ms. Hiatt once again told Nurse Ahwal, "[y]ou are going to fail your inspection based on this." (*Id.*) Plaintiff maintains that he told them that he was going to report the consent issue as well. (*Id.*)

3

Ms. Hiatt, on the other hand, testified that Plaintiff "absolutely" did not state he was going to report Defendants to the state—she repeated "[t]hat did not happen." (Defs.' 56.1 Stmt. ¶ 46.) Although Ms. Hiatt did testify as to certain deficiencies with Defendants' H&P and consent practices, she was "absolutely certain" that she did not see anything at Kips Bay that constituted Medicaid fraud.  (*Id.* ¶ 44.)

For instance, she testified "that the documentation that was in the chart was not sufficient to meet the federal guidelines or the accreditation guidelines" and that "many of the H&Ps in the charts that [she] reviewed would not have met the definition of a comprehensive H&P which is the Medicare requirement."  (Pl.'s 56.1 Counter-Stmt., ¶ 44.)  She also testified that some physicians "did extremely complete H&Ps and some did incomplete H&Ps" but "[i]t wasn't standardized."  (*Id.*)  Ms. Hiatt identified the H&P issue as "a very significant issue" and a requirement for "being eligible to receive Medicare funding."  (*Id.*)  In Ms. Hiatt's report, this issue was the only issue identified "as required to be corrected immediately to avoid significant . . . deficiencies" and "the only thing [she] identified in red boldface type in that manner."  (*Id.*)

Ms. Hiatt recalled speaking with Plaintiff "about the fact that the consent was being obtained in the procedure room immediately prior to anesthesia." (*Id.*)  She further testified that she "questioned the practice" and "felt both consents lacked specific information related to risks and benefits which should be in the consent.   [She] specifically identified risks" and "recommended . . . that they reference their own professional societies to improve the consent form." (*Id.*)

Dr. Mighion testified that she did not recall anyone stating during the mock survey or during the procedure with Plaintiff that there were Medicare violations or that Plaintiff or anyone else was going to report Kips Bay to the state, though she would recall such events if they had in

fact occurred. (Defs.' 56.1 Stmt. ¶ 47.)  Similarly, Nurse Ahwal and Dr. Khaykis stated that neither Consultant said anything about Kips Bay's procedures constituting Medicaid fraud, and that Plaintiff never stated he would report Kips Bay to any state regulatory authority.  (*Id.* ¶ 44.)

Plaintiff testified that the day after the procedure, he placed a call to the state and "found out how to [report a complaint]" and that "over the next couple of days or weeks, [he] found out [he] had to report it in writing to various offices of the state and federal government." (Pl.'s 56.1 Counter-Stmt. ¶ 44.)  However, Plaintiff did not make such a written report at that time.

On January 12, 2012, two days after the procedure, Plaintiff was fired during a meeting with Dr. Friedlander.  (Defs.' 56.1 Stmt. ¶ 59.)  Plaintiff contends that Dr. Friedlander told him that "there was a meeting of the board and the board was very unhappy with what [he] had said to the inspectors." (Pl.'s 56.1 Counter-Stmt. ¶ 48.)  However, Dr. Friedlander testified that he did not confer with anyone prior to terminating Plaintiff, and that at no time did the Consultants nor any employee of Defendants inform him that Plaintiff had made any comments about reporting Defendants to the state or federal authorities.  (Defs.' 56.1 Stmt. ¶¶ 58, 61.)  Plaintiff testified that he did not mention what occurred during his interactions with the Consultants nor Medicaid fraud issues to Dr. Friedlander when he was being terminated.  (*Id.* ¶¶ 48, 59.)  And members of the Board of Managers said that they were unaware of any threatened reports or complaints made by Plaintiff at any time during his employment, including at the time of his termination.  (*Id.* ¶ 62.)  Plaintiff filed a written complaint with a government agency for the first time regarding the alleged misconduct over three months after his termination on April 18, 2012.[3]  (Defs.' 56.1 Stmt. ¶ 82; undisputed *see* Pl.'s 56.1 Counter-Stmt. ¶ 82.)

---

[3] Plaintiff's first written complaint was filed with the U.S. Department of Health & Human Services, Office of Inspector General.  (Defs.' 56.1 Stmt. ¶ 84(a).)  Subsequently, Plaintiff filed a series of other reports with, *inter alia*, the New York State Office of Attorney General on April 23, 2012, and the Office of

Dr. Friedlander testified that he decided to terminate Plaintiff after Ms. Hiatt informed him that she identified a number of problems with Plaintiff's performance during the procedure, including poor hand hygiene, incessant talking, muting alarms, and lack of attention to the patient. (*Id.* ¶¶ 36–43.) Dr. Mighion recalled that Plaintiff was "talking a lot" and made an inappropriate comment. (Mighion Dep. Tr., ECF No. 54-3, at 46:2–15.) Ms. Hiatt testified that in her entire career, which includes assisting in over ten thousand endoscopies, she never observed a provider, other than Plaintiff, who had a combination of poor hand hygiene, unsafe injection practices, was distracted and talking while the alarm was muted, handed a patient off in an unsafe way, and who "was sloppy in a serial way, in a continuous manner in all those areas." (Defs.' 56.1 Stmt. ¶ 53.)

Ms. Hiatt's complaint was not the first time Plaintiff had performance issues at Kips Bay. Plaintiff had been placed on probation in May 2009 due to complaints from patients. (*Id.* ¶ 19.) More specifically, according to incident reports, Defendants received the following complaints:

- on April 27, 2009, Plaintiff discussed personal problems with a patient, a discussion the patient found "uncomfortable and inappropriate[;]"

- on April 30, 2009, while alone in the room with a patient, Plaintiff said "it gives me more time to kill you," which made the patient more nervous;

- on May 5, 2009, after several failed attempts inserting an IV, Plaintiff did not listen to the patient and told her that it was "a little more difficult due to her skin color[;]"

- on May 6, 2009, Plaintiff told a patient that since her nipples were still intact following a bilateral mastectomy and due to her family history of cancer she still had a possibility of getting cancer;

Professional Medical Conduct on June 14, 2012. (*Id.* ¶¶ 84(b)–(e).) Plaintiff's complaints have not triggered an investigation by any state or federal agency. (*Id.* ¶ 87.)

- on May 8, 2009, Plaintiff made inappropriate jokes that made the patient anxious. When the patient informed Plaintiff that IV insertion was painful and that he faints easily, Plaintiff stated "you won't faint."  The patient subsequently fainted. Plaintiff then suggested that the patient may have some type of syndrome;

- Plaintiff was "impersonal, rough, and uncaring."

(*Id.* ¶¶ 21–25, 27(b).)  Dr. Friedlander testified that he was urged by Dr. Monkcom, Director of Anesthesia Services, and other doctors to fire Plaintiff after he was placed on probation in 2009. (*Id.* ¶ 28; Dr. Friedlander Dep. Tr., ECF No. 54-1, at 56:2–3.)  He pointed out that "[m]any of [Plaintiff's] colleagues did not want to work with him anymore for a variety of reasons, and that Plaintiff "was a disruptive force amongst the anesthesiologists."  (Dr. Friedlander Dep. Tr. at 54:23–55:3.)  However, despite these complaints, he chose not fire Plaintiff because he wanted to mentor Plaintiff and he liked him on a personal level.  (Defs.' 56.1 Stmt. ¶ 29.)  Dr. Friedlander testified that Ms. Hiatt's report was the "last straw" and he realized that despite everything he had done over the years to help Plaintiff, he "could not protect him anymore" because "[Plaintiff] would not change." (*Id.* ¶ 57; Dr. Friedlander Dep. Tr. at 51:25–52:4.)  So he decided to terminate Plaintiff's employment.  (*Id.*)

## II.   LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The party moving for summary judgment has the

burden of demonstrating that no genuine issue of material fact exists. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact, and it "may not rely on conclusory allegations or unsubstantiated speculation." *See Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted), *cert. denied*, 534 U.S. 891 (2001). A grant of summary judgment is therefore warranted where the non-moving party has "failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim on which the [non-moving party] bear[s] the burden of proof." *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (internal quotation marks omitted).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). The court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987), *cert. denied*, 484 U.S. 977 (1987).

"When a case turns on the intent of one party, as retaliation claims often do, a 'trial court must be cautious about granting summary judgment.'" *Balko v. Ukrainian Nat'l Fed. Credit Union*, No. 13 Civ. 1333, 2014 U.S. Dist. LEXIS 42427, at *23 (S.D.N.Y. Mar. 28, 2014) (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship.*, 22 F.3d 1219, 1224 (2d Cir. 1994). "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one

direction that any contrary finding would constitute clear error." *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 54 (2d Cir. 1998) (internal citations omitted). "Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of retaliation, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer." *Balko*, 2014 U.S. Dist. LEXIS 42427, at *25 (collecting cases); *see, e.g., Douglass v. Rochester City Sch. Dist.*, 522 F. App'x 5, 7 (2d Cir. 2013); *Karlen v. Landon*, 503 F. App'x 44, 48 (2d Cir. 2012). "In other words, to defeat summary judgment, 'the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based' on retaliatory motive." *Balko*, 2014 U.S. Dist. LEXIS 42427, at *25 (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

## III.   PLAINTIFF'S CLAIM UNDER THE FEDERAL FALSE CLAIMS ACT

Plaintiff claims that Defendants retaliated against him in violation of the "whistleblower" provision of the FCA, 31 U.S.C. § 3730(h)(1), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

This provision "was intended to protect persons who assist in the discovery and prosecution of fraud, because 'few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or any other form of retaliation.'" *Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614, 2000 WL 1682759, at *11 (S.D.N.Y. Nov. 9, 2000) (quoting S. Rep. No. 99-345, at 34 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5299). Thus, "Congress enacted [Section] 3730(h) to encourage any individuals knowing of Government fraud to bring

9

that information forward." *McAllan v. Von Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007) (internal quotation marks omitted).

To sustain an action under Section 3730(h), Plaintiff must prove that: (1) the employee engaged in protected conduct under the FCA; (2) the employer knew that the employee engaged in the protected conduct; and (3) the employee was discharged, discriminated against, or otherwise retaliated against by the employer because of the protected conduct. *Garcia v. Aspira of N.Y., Inc.*, No. 07 Civ. 5600, 2011 WL 1458155, at *3 (S.D.N.Y. Apr. 13, 2011).

### a. Protected Conduct

Protected conduct is defined as "[1] lawful acts done by the employee . . . in furtherance of an action under [31 U.S.C. § 3730(h)(1)] or [2] other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1); *see also Swanson v. Battery Park City Auth.*, No. 15–CV–6938, 2016 WL 3198309, at *3 (S.D.N.Y. June 8, 2016). Within the second category of protected conduct, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." *Swanson*, 2016 WL 3198309, at *3 (quoting *Malanga v. N.Y.U. Langone Med. Ctr.*, No. 14–CV–9681, 2015 WL 7019819, at *2 (S.D.N.Y. Nov. 12, 2015)). Moreover, a plaintiff "need not prevail on his underlying FCA claims," but he must "demonstrate that he had been investigating matters that were calculated, or reasonably could have [led], to a viable FCA action." *Empire Educ. Corp.*, 959 F. Supp. 2d 248, 256 (N.D.N.Y. 2013) (citing *U.S. ex rel. Sasaki v. N.Y.U. Med.*, No. 05–CV–6163, 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012)).

Plaintiff contends that his protected conduct consisted of his statements during the mock inspection that he was going to report Defendants for Medicare fraud based on improper H&P practices and consent procedures. (Opp'n at 7.) However, aside from Plaintiff's own contention,

Plaintiff has failed to come forth with *any* evidence—direct or circumstantial—to support his claim that he made such statements. Plaintiff offers no emails, no memoranda, no reports, no board meeting minutes, and most importantly, no testimony from any of the people who were present when he allegedly made such statements to support his claim.[4] Although Ms. Hiatt recalls having a discussion with Plaintiff about H&Ps and consent forms, she unequivocally testified that Plaintiff "absolutely" did not state the he was going to report Defendants. (Defs.' 56.1 Stmt. ¶ 46.) In fact, even though Plaintiff claims that Ms. Hiatt was the one who told him that these practices constituted Medicaid fraud, she testified that she was "absolutely certain" that she did not see anything at Kips Bay that would be Medicaid fraud. (*Id.* ¶ 44.) Dr. Mighion, another independent consultant present at the time, also did not recall such an exchange ever occurring. (*Id.*) Plaintiff's claim is further contradicted by the two Kips Bay employees, Nurse Ahwal and Dr. Khaykis, who have said that Plaintiff never made statements about reporting Kips Bay to the state. (*Id.*)

Plaintiff claims that he engaged in protected conduct, but all of the evidence on the record says otherwise.[5] This is not a genuine issue of material fact. To raise a genuine issue of material fact Plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). *See Liburd v. Bronx Leb. Hosp. Ctr.*, 2009 U.S. Dist. LEXIS 61131, at *38–39 (S.D.N.Y. Apr. 2, 2009), *aff'd* 372 F. App'x. 137, 2010 U.S. App. LEXIS 7857 (2d Cir. 2010) (finding no genuine issue of material fact when

---

[4] Unlike in other cases where the *only* direct evidence available very often centers on what the plaintiff contends defendant allegedly said or did, here, there are third-party witnesses who corroborate Defendants' story (*i.e.* the independent consultants, Ms. Hiatt and Dr. Mighion).

[5] It is even doubtful that the conversation as Plaintiff relates it would meet the definition of protected conduct to expose fraud. Moreover, Plaintiff took no action to report any alleged Medicaid fraud until more than three months after his termination.

plaintiff offered "no evidence to support" her claim that someone had relayed her concerns about "missing" computers to a supervisor).   Plaintiff "may not rely on conclusory allegations or unsubstantiated speculation" to meet his burden of proof.   *See Fujitsu Ltd.*, 247 F.3d at 428 (internal quotation marks omitted).   Accordingly, Plaintiff fails to meet the first factor under section 3730(h).   For that reason alone summary judgment is appropriate.

### b.  Employer's Knowledge of Protected Conduct

Even if Plaintiff could show that he engaged in protected conduct, Plaintiff still fails to establish retaliation because there is no evidence that his supervisor, Dr. Friedlander, was made aware of any protected conduct prior to terminating Plaintiff's employment.   Absent notice to Dr. Friedlander, "*a fortiori*, [Dr. Friedlander's] actions could not constitute retaliation." *Faldetta*, 2000 WL 1682759 at *13; *see also United States ex rel Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) ("[U]nless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h).").

Plaintiff argues that it is reasonable to infer that one or more of those present during his conversation with the Consultants would have informed Dr. Friedlander or another member of management about Plaintiff's statement because of its seriousness.   (Opp'n at 9–10.)   However, all individuals have testified that Plaintiff never made such statements and therefore did not inform Dr. Friedlander about them.   (Defs.' 56.1 Counter-Stmt. ¶ 44.)

Plaintiff also argues that Dr. Friedlander must have been aware of the statements because at his termination he said "there was a meeting of the board and the board was very unhappy with what [he] had said to the inspectors." (*Id.* ¶ 48.)   He argues that is it reasonable to infer that Dr. Friedlander was referring to the statements about reporting Defendants to the state.   However, it is not reasonable to make such an inference when (1) Dr. Friedlander has testified that he had no

knowledge of Plaintiff's alleged statements when he terminated him, (2) those present when Plaintiff made the alleged statements have all testified that they did not inform Dr. Friedlander about Plaintiff's statements because they never happened, (3) Plaintiff conceded that Dr. Friedlander and he did not discuss his alleged statements to the Consultants before or during his termination, (4) all five members of the Board of Managers have said that they were unaware of any threatened reports or complaints made by Plaintiff at any time during his employment and termination, and (5) Plaintiff offers no evidence (i.e. board meeting minutes or notes) to the contrary.

Plaintiff seeks a number of inferences to overcome summary judgment. However, considering all of the evidence on the record, it is unreasonable to draw these inference in Plaintiff's favor. *See, e.g., Apex Oil Co.*, 822 F.2d at 252–53 ("the Supreme Court has indicated that trial courts should draw only reasonable inferences in favor of the non-moving party viewing the evidence as a whole") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1357 (1986) and *Int'l Distribution Centers, Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793–94 (2d Cir. 1987)).

### c.  Retaliatory Motive

Finally, to satisfy his FCA claim, Plaintiff must show that Defendants retaliated against him "because of the protected conduct." *Garcia*, 2011 WL 1458155, at *3. "Although not squarely addressing the issue, the Second Circuit has implicitly endorsed the application of the *McDonnell Douglas* framework to Section 3730(h) claims." *Forkell v. Lott Assisted Living Corp.*, 2012 U.S. Dist. LEXIS 72898, at *26 (S.D.N.Y. May 21, 2012) (citing *Liburd* and applying burden-shifting framework to 3730(h) claim). Under the *McDonnell Douglas* framework (1) the employee bears the initial burden of producing evidence sufficient to support a *prima facie* case

13

of retaliation; (2) the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) the burden shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation. *See Forkell*, 2012 U.S. Dist. LEXIS 72898, at *27–28 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

Even if Plaintiff had established a *prima facie* retaliation case, Defendants have shown sufficient evidence of a legitimate, non-retaliatory reason for Plaintiff's termination—his overall poor performance. The evidence shows that Plaintiff's performance had been a problem even before the mock survey. He had been placed on probation in 2009 due to a number of patients complaining about Plaintiff's inappropriate remarks and conduct that made patients feel uncomfortable and nervous around him. Patients described him as "impersonal, rough, and uncaring."[6]   Dr. Friedlander described him as being "a disruptive force amongst the anesthesiologists"[7] so much so that the Director of Anesthesia Services called for Plaintiff's termination after he had been placed on probation. Although Dr. Friedlander thought he could help Plaintiff improve, Ms. Hiatt's assessment detailing Plaintiff's sloppy performance including poor hand hygiene, incessant talking, unsafe injection practices, and unsafe treatment of a patient, was the "last straw" that led to Plaintiff's termination. (Defs.' 56.1 Counter-Stmt. ¶ 53–57.)

To overcome Defendants' legitimate reason, Plaintiff must produce "sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the [defendants] were false, and that more likely than not [retaliation] was the real reason for the employment action." *Forkell*, 2012 U.S. Dist. LEXIS 72898, at *34 (internal citations omitted). Plaintiff argues that Defendants' proffered explanation "positively reeks of pretext" because he

---

[6] (Defs.' 56.1 Counter-Stmt. ¶ 27(b).)
[7] (Dr. Friedlander Dep. Tr., at 54:23–55:3.)

alleges that Ms. Hiatt was not in the room when the procedure was being performed and therefore, she did not observe Plaintiff's performance. (Opp'n at 11–13.) However, Ms. Hiatt, Dr. Mighion, Nurse Ahwal, and Dr. Khaykis have all confirmed that the Consultants were present during the procedure. (Defs.' 56.1 Stmt. ¶ 36.)

Because his allegations of retaliation are premised solely upon his own contentions, contradicted and unsupported by direct or circumstantial evidence, he has "failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his . . . favor" as to any element of his claim. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (internal quotation marks omitted).

Defendants' summary judgment motion dismissing Plaintiff's federal FCA claim is granted.

## IV.  PLAINTIFF'S CLAIM UNDER THE NEW YORK FALSE CLAIMS ACT

The NYFCA whistleblower provision, N.Y. State Fin. Law § 191, is essentially identical in language and substance to the federal FCA. *Forkell*, 2012 U.S. Dist. LEXIS 72898, at *35; *Swanson*, 2016 WL 3198309, at *2 ("The NYFCA is closely modeled on the FCA. Accordingly, '[c]ourts interpret [NYFCA provisions] by closely tracking judicial interpretation of its federal counterpart.'") (internal citations omitted). Therefore, Defendants are entitled to summary judgment on Plaintiff's New York FCA claim for the same reasons articulated with respect to Plaintiff's federal claim. *See United States ex rel. Pervez v. Beth Isr. Med. Ctr.*, 736 F. Supp. 2d 804, 816 (S.D.N.Y. 2010).

## V.  ATTORNEYS' FEES AND COSTS

31 U.S.C. § 3730(d)(4) provides that "the court *may* award to the defendant its reasonable attorneys' fees and expenses if the defendant prevails in the action and the court finds that the

claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." (emphasis added). Award of attorneys' fees is discretionary, *see, e.g., Woe v. Cuomo,* 729 F.2d 96, 108 (2d Cir. 1984) (issue of attorney's fees more appropriately left to discretion of conscientious district judge), *cert. denied,* 469 U.S. 936 (1984). The record does not warrant the exercise of this Court's discretion to award attorneys' fees or costs. Defendants' request is DENIED.

## VI.    CONCLUSION

Defendants' motion for summary judgment is GRANTED. Defendants' request for attorneys' fees and costs is DENIED.

The Court of Clerk is directed to close the motion at ECF No. 51 and this action.

Dated: New York, New York
       September 8, 2017

SO ORDERED.

GEORGE B. DANIELS
United States District Judge